24-1383

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

ZACHARY HEBB,

*Plaintiff-Appellee,*

v.

CITY OF ASHEVILLE, NORTH CAROLINA
AND BEN WOODY

*Defendants-Appellants,*

On Appeal from the United States District Court for the Western District of
North Carolina, Asheville Division

### BRIEF OF APPELLEE ZACHARY HEBB

B. Tyler Brooks
Thomas More Society
309 W. Washington St., Ste. 1250
Chicago, IL 60606
312-782-1680
tbrooks@thomasmoresociety.org

Nathan W. Kellum
First Liberty Institute
699 Oakleaf Office Lane
Suite 107
Memphis, TN 38117
(901) 684-5485
nkellum@firstliberty.org

Jeffrey C. Mateer
First Liberty Institute
2001 W. Plano Pkwy.,
Suite 1600
Plano, TX 75075
(972) 941-4444
jmateer@firstliberty.org

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and 4th Cir. R. 26.1, Plaintiff-Appellee Zachary Hebb is neither a subsidiary nor an affiliate of a publicly-owned corporation. Neither is Plaintiff-Appellee aware of any publicly-held corporation, whether or not a party to the present litigation, that has a direct financial interest in the outcome of this litigation.

<u>s/ Nathan W. Kellum</u>         <u>9/23/24</u>
Nathan W. Kellum                Date

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................iv

STATEMENT OF ISSUES............................................................................. 1

STATEMENT OF CASE ................................................................................ 2

SUMMARY OF ARGUMENT ...................................................................... 15

ARGUMENT................................................................................................. 16

    I.    Asheville's Ban on "Amplified Sound" Outside of AHC Clinic Violates Hebb's Right to Free Speech ..................................................... 17

        A.    Hebb's speech outside of AHC clinic is constitutionally protected and public rights-of-way are traditional public fora............................ 17

        B.    Asheville ordinance § 10-85(2) is not a reasonable time, place, or manner restriction ..................................................................... 19

            1.    The ban on amplified speech and plastic cones does not further a substantial government interest........................... 19

                a.  The supposed interest is not genuine ........................... 20

                b.  The supposed interest is not in line with the restriction............. 23

            2.    The ban on amplified speech and plastic cones is not narrowly tailored.................................................................. 24

                a.  Ordinance removes too much speech ........................... 25

                b.  Ashville cannot show alternative regulations are inadequate..... 29

            3.    The ban on amplified speech and plastic cones does not leave viable alternatives for communication.................................. 32

    II.  Asheville's Ban on Plastic Cones Outside AHC Clinic Violated Hebb's Right to Due Process ...................................................................... 34

    III. Hebb is Entitled to Relief From and For Constitutional Violations.............. 36

    A.   Hebb deserves permanent injunction to prevent ham in the future .......36

    B.   Hebb deserves nominal damages for harm incurred in the past..............37

CONCLUSION...................................................................................................38

STATEMENT REQUESTING ORAL ARGUMENT..................................................38

# TABLE OF AUTHORITIES

## CASES

*Billups v. City of Charleston*, 961 F.3d 673 (4th Cir. 2020) ................................ 19, 24, 25, 29

*Brown v. Town of Cary*, 706 F.3d 294 (4th Cir. 2013) .......................................... 19

*Carey v. Piphus*, 435 U.S. 247 (1978) ................................................................ 37

*Casey v. City of Newport, R.I.*, 308 F.3d 106 (1st Cir. 2002) ................................ 28

*Child Evangelism Fellowship of S.C. v. Anderson Sch. Dist. Five [CEF]*,
 470 F.3d 1062 (4th Cir. 2006) .................................................................. 19, 32

*City of Ladue v. Gilleo*, 512 U.S. 43 (1994) ..................................................... 21, 33

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788 (1985) ......................... 17

*eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) ....................................... 36

*Edwards v. City of Coeur d'Alene*, 262 F.3d 8567 (9th Cir. 2001) .............................. 34

*Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co.*, 95 F.4th 181 (4th Cir. 2024) .... 16

*Evans v. Chalmers*, 703 F.3d 636 (4th Cir. 2012) ............................................... 16

*Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123 (1992) ................................... 25

*Frisby v. Shultz*, 487 U.S. 474 (1988) ........................................................ 18, 24

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ............................................. 34

*Hicks v. Ferreyra*, 64 F.4th 156 (4th Cir. 2023) .............................................. 37

*Hill v. Colorado*, 530 U.S. 703 (2000) ........................................................ 17, 22

*Hulbert v. Pope*, 70 F.4th 726 (4th Cir. 2023) ............................................... 20, 23

*Johnson v. Bergland*, 586 F.2d 993 (4th Cir. 1978) ........................................... 36

*Lytle v. Doyle*, 326 F.3d 463 (4th Cir. 2003) ............................................... 35, 36

*Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 761 (1994) .............................. 18, 22

*McCullen v. Coakley*, 573 U.S. 464 (2014) ..................................................... passim

*Medlin v. Palmer*, 874 F.2d 1085 (5th Cir. 1989)......................................28

*Metro. Washington Airports Auth. v. Pan*, 106 F.4th 355 (4th Cir. 2024) ..........................16

*Newsom v. Albemarle County Sch. Bd.*, 354 F.3d 249 (4th Cir. 2003) ..................................37

*O'Connell v. City of New Bern*, 447 F. Supp. 3d 466 (E.D.N.C. 2020)..............................27

*Occupy Columbia v. Haley*, 738 F.3d 107 (4th Cir. 2013) ......................................18

*Pine v. City of West Palm Beach*, 762 F.3d 1262 (11th Cir. 2014)........................................27

*Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92 (1972) ...................................24

*Reeves v. McConn*, 631 F.2d 377 (5th Cir. 1980) ............................................ 26, 33

*Reynolds v. Middleton*, 779 F.3d 222 (4th Cir. 2015) .................................17, 23, 24

*Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819 (1995) ..................................25

*Ross v. Early*, 746 F.3d 546 (4th Cir. 2014) ..................................... 19, 20, 23, 32

*Saia v. New York*, 334 U.S. 558 (1948)........................................................ passim

*Saieg v. City of Dearborn*, 641 F.3d 727 (6th Cir. 2011) ......................................22

*Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756 (4th Cir. 2021) ..................................17

*Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622 (1994) ......................................20

*U.S. Labor Party v. Pomerleau*, 557 F.2d 410 (4th Cir. 1977) ........................... 18, 25, 26, 35

*United States v. Comer*, 5 F.4th 535 (4th Cir. 2021)..............................................34

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976)........33

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989)........................................ 24, 25

*Warren v. Fairfax Cty.*, 196 F.3d 186 (4th Cir. 1999) ............................................18

*Weinberg v. City of Chicago,* 310 F.3d 1029 (7th Cir. 2002) .............................. 33, 34

## STATEMENT OF ISSUES

This appeal presents the following questions:

1.      Does an ordinance that bans "amplified sound" on public ways outside an abortion clinic advance a significant government interest in curbing excessive noise when it also allows electronic amplification from the grounds of the abortion clinic itself?

2.      Is an ordinance that bans "amplified sound" on public ways outside an abortion clinic narrowly tailored to curb excessive noise when it encompasses in its proscription speech that is not loud or raucous?

3.      Is an ordinance that bans "amplified sound" on public ways outside an abortion clinic narrowly tailored to curb excessive noise when it proscribes speech thousands of feet away from the abortion clinic?

4.      Is an ordinance that bans "amplified sound" on public ways outside an abortion clinic narrowly tailored to curb excessive noise when the City has less-speech-restrictive methods available to address the purported concern?

5.      Does an ordinance banning "amplified sound" on public ways outside an abortion clinic that effectively eliminates conversational speech leave open ample alternative means of communication?

6.      Is an ordinance banning "amplified sound" on public ways outside an abortion clinic that applies to plastic cones unduly vague?

# STATEMENT OF CASE

### *Zachary Hebb Wants to Converse with Others about Abortion*

Believing abortion is the wrongful killing of human life (JA125), Appellee Zachary Hebb (Hebb) would like to convey his thoughts on this topic with others, especially those visiting Planned Parenthood Asheville Health Center (AHC) clinic, an abortion clinic in Asheville. (JA009; JA088; JA124-JA125).[1]  Hebb began sharing his beliefs on public ways near AHC clinic in March of 2019. (JA127).  He tries to convince pregnant women and their families and friends to not go forward with the procedure due to the harm it would cause the mothers as well as their preborn babies. (JA126).  Hebb offers tangible aid, like medical care, baby supplies, and money, so they can consider keeping their babies. (JA126).  He also gives them information about adoption. (JA126).  Additionally, Hebb likes to tell AHC clinic visitors about the merits of his Christian faith. (JA126-JA127).

Hebb's primary and most effective means for communicating his life-affirming message at AHC clinic is oral speech, and specifically through amplification, or, if not available, a plastic cone. (JA127; JA149).  He does not wish to yell at the visitors but have conversations with them. (JA128).  From where he is required to stand outside clinic grounds, an amplifier or plastic cone lets Hebb speak winsomely with his intended audience as they are walking from the parking lot to the clinic. (JA127-JA128).  Hebb

---

[1] All facts set out herein are undisputed.

requires use of these devices within a reasonable distance of ACH clinic so he can be heard and seen and interact with his audience. (JA128).

### *Ashville Explores Changes to Noise Ordinance*

Around that same time Hebb started going to AHC clinic, Asheville was considering changes to its noise ordinance, Chapter 10, Article IV of the Asheville Code of Ordinances. (JA011-JA012). Ben Woody (Woody), then director of Development Services Department (DSD), along with other City staff members, initiated a project to revamp the noise ordinance. (JA012; JA090). With Woody serving as head of the project, the group analyzed noise data, reviewed noise ordinances from other municipalities, and launched a city-wide survey, a web page, and a NoiseScore app. (JA012; JA090; JA151-180). They also conducted a series of focus meetings with stakeholders believed to have an interest in the proposed changes. (JA39; JA090; JA181-JA202). Through the information gleaned, the top noise concerns identified were neighbor noise/dog barking, construction noise, music over-amplification, industrial/institutional facilities and equipment, fireworks, and trash pick-up. (JA181-JA202).

On December 17, 2019, Woody provided an update to the Public Safety Committee of Asheville City Council, reporting on findings, identifying essentially the same noise concerns. (JA014-JA015; JA090-JA091; JA203-JA229). The next steps were to draft a noise ordinance, elicit public feedback, and present a proposed ordinance to City Council for consideration. (JA015; JA203-229). However, due to onset of

COVID-19, Woody's group did not release the proposed noise ordinance to the public until November 20, 2020. (JA015; JA091; JA230-JA242). This revised version contained several updates on noise criteria and enforcement measures relating to construction, music over-amplification (venues, outdoor events, and buskers), vehicle exhaust/revving, refuse collection, residential, commercial/industrial, fireworks, and dogs and animals. (JA015-JA016; JA091; JA230-242). The proposed noise ordinance did not contain any restrictions on amplified noise outside of medical clinics or public schools. (JA016; JA091).

After securing public feedback, on January 26, 2021, Woody and City staff reported to again to the Public Safety Committee on the proposed noise ordinance, identifying the same noise concerns. (JA230-242). But they held off on going any further with the noise ordinance due to COVID-related public health measures. (JA016; JA091; JA230-242).

### *AHC Clinic Presses for a Buffer Zone Addendum to the Noise Ordinance*

In the meantime, in February of 2021, Asheville City Council member Gwen Wisler (Wisler) visited with Nikki Harris (Harris), a representative of Planned Parenthood South Atlantic, and AHC clinic manager Kat Lewis (Lewis) and staff member McCoy Faulkner, about their complaints regarding anti-abortion activity taking place outside AHC clinic. (JA243-JA244). Harris followed up with an email to Wisler asking for help with the situation. (JA243-JA244). And Wisler soon looped Asheville City Manager Debra Campbell (Campbell) into the conversation. (JA243-JA244). Then,

at some point during the week of May 16 of 2021, Council member Wisler forwarded to Woody and Harris proposed language for an addendum to the noise ordinance containing an amplification ban as way to resolve the concerns about pro-life presence outside AHC clinic. (JA245-JA249). Woody forwarded the proposed language to City legal department, who supported the verbiage, with some minor changes. (JA245-JA249).

On the evening of May 27, 2021, Harris sent an email to Woody inquiring about the addendum to the noise ordinance that would place a buffer zone around AHC clinic. (JA245-JA249). Harris asked how Planned Parenthood could help facilitate adoption of this new language, indicating a willingness to provide public comments in support of the buffer zone. (JA245-JA249). The next morning, on May 28, 2021, Woody replied to Harris' inquiry, stating he would like to include the language inserting a buffer zone, informing the legal department had generally supported the language. (JA245-JA249). He wrote that he would get with Campbell, the city manager, about the language, but would recommend inclusion of the addendum. (JA245-JA249).

A few days later, on June 1, 2021, Woody presented an update on the noise ordinance to the Public Safety Committee. (JA018-JA019; JA093; JA251-JA274). During which time, Woody did not specify any concerns about noise outside of medical clinics or public schools; rather, he confirmed the top noise concerns as he had delineated previously. (JA251-JA274). He detailed how decibel levels would be imposed in central business, commercial, and industrial districts, while a multi-factorial

noise disturbance standard would apply in public spaces, rights-of-way, and residential areas, just as it did with the current noise ordinance in place. (JA019-JA020; JA094; JA251-JA274). The Public Safety Committee also received public comments about the noise ordinance. (JA020; JA094; JA275-JA282). Most of the comments concerned music venues, but several individuals affiliated with AHC clinic added comments about amplified noise outside AHC clinic. (JA275-JA282). Lewis, AHC clinic manager, sent an email specifically requesting the revised noise ordinance include a ban on noise within 100 to 200 feet of any medical clinic. (JA021; JA094; JA274-JA282). Following up on the email, that same day, Lewis left a voicemail to the committee, reiterating her request for a restriction within 100 to 200 feet of the clinic. (JA021; JA094).

The day following the committee meeting, June 2, 2021, Harris emailed Woody again, expressing concern that she did not hear him mention the buffer zone addendum to the committee, and asked him to confirm the additional language was added to the noise ordinance. (JA245-JA249). Replying to this concern, Woody assured Harris of his intention to add the buffer zone language to the ordinance when he presented it to the City Council. (JA245-JA249). One week later, on June 9, 2021, Harris emailed Woody another time, checking on the status of the sought-after language. (JA245-JA249). Woody advised the draft was not yet ready, but confirmed that he would include the buffer zone addendum in the ordinance. (JA245-JA249). Later that month, on June 21, 2021, Harris emailed Woody, once more checking on the additional language, asking about City Council hearing. (JA245-JA249). And Woody responded,

advising he would present the amplification ban around medical clinics to Asheville City Council. (JA245-JA249).

The next day, on June 22, 2021, Woody brought the revised noise ordinance containing an amplification ban to Asheville City Council. (JA021; JA095). In his presentation, Woody described the same noise concerns he relayed to the committee, which did not include noise around medical clinics or schools. (JA021; JA095; JA283-311). He expounded on how the proposed noise ordinance supplies objective decibel levels for certain districts and a multi-factor noise disturbance standard for public spaces and residential districts. (JA022; JA095; JA283-JA311). Woody also briefly introduced the late insertion of an amplification ban: "The other thing is we want to, we were proposing to prohibit amplified sound within 150 feet of a public school or a health care facility. Those are places where services are happening and quiet is important for those services." (JA022; JA095). He voiced his intention to bring up the proposal again later in the summer for approval. (JA023; JA095; JA251-JA274).

### *Prior to Buffer Zone, Ashville Applies Noise Disturbance Standard to Hebb*

A couple of days later, on June 26, 2021, Hebb went to the public way in front of AHC clinic to share his beliefs with individuals visiting the clinic through use of an amplifier. (JA131-JA132). Woody was there too and issued Hebb a citation for violating the noise disturbance standard. (JA025; JA097; JA132-JA134; JA313). Hebb received another citation from Woody for using an amplifier in front of AHC clinic on July 24, 2021. (JA025; JA097; JA134; JA314). Hebb planned to go back to a public spot outside

AHC clinic and use amplification again, but to avoid another citation, he intended lower the volume of his speech. (JA134).

### *Asheville Adopts § 10-85(2) Implementing a Buffer Zone Around AHC Clinic*

Several days later, on July 27, 2021, Woody and City staff presented the noise ordinance to the City Council for a vote, incorporating the amplification buffer zone around medical clinics and public schools. (JA026; JA098; JA315-JA321). Woody explained how the proposed ordinance addressed topics that came up during public engagement, referencing regulations for construction, refuse collection, vehicle/exhaust/revving, commercial/industrial equipment, music over-amplification, fireworks, residential neighbors, and dogs and animals. (JA026; JA315-JA321). The presentation did not identify noise outside of medical clinics and/or publics schools as a noise concern. (JA026; JA315-JA321). And Woody reiterated that the ordinance retains the noise disturbance standard for public spaces, and rights-of-way (JA026; JA098; JA315-JA321). But Woody reminded the City Council that amplified speech within 150 feet of medical clinic or public school would be subject to a ban in the ordinance instead of an evaluation under the noise disturbance standard. (JA027; JA098; JA315-JA321).

On this date, July 27, 2021, Asheville City Council passed the proposed noise ordinance containing the amplification ban set out in § 10-85(2). (JA027; JA098; JA322-JA331). This section reads in pertinent part:

> Unless otherwise allowed by this chapter, no person shall engage in any of the following enumerated activities:
>
> ***
>
> (2) Producing, or causing to be produced amplified sound within 150 feet of the property line of a public school where classes or other educational activities are occurring, or a medical clinic that is open or otherwise caring for patients. (JA322).

The City also posted information online about the updated noise ordinance to the public to answer frequently asked questions, which addressed inquiries about how the updated noise ordinance regulated trash and collection noise, construction noise, music venues, restaurants, night clubs, and bars, outdoor events, vehicle noise, commercial fireworks display, busking, and animal noise. (JA332-JA336). The frequently-asked-questions section did not include any questions or responses about regulation of noise outside of medical clinics or public schools. (JA332-JA336).

### Section 10-85(2) Prohibits Hebb's Conversational Speech Outside AHC Clinic

Up until the ordinance came into effect on September 15, 2021, Hebb had successfully used amplification on public ways near AHC clinic by lowering his volume. (JA135). Hebb, though, had heard about the passage of § 10-85(2) and feared the ordinance would eliminate his amplified speech. (JA135). And his fears were soon realized, as Asheville started enforcing the amplification ban on the operative date, even applying the restriction to the use of plastic cones. (JA028-JA029; JA099-JA100).

The existence and enforcement of § 10-85(2) had a chilling effect on Hebb's speech. (JA136). As Hebb discovered, the ban is much larger than the already sizable 150-foot perimeter depicted in the ordinance, with the buffer zone around AHC clinic overlapping into buffer zones of surrounding medical clinics, effectively extending the ban on amplification and plastic cones far beyond AHC clinic property, going well over a thousand feet in most directions. (JA028; JA100; JA136-JA137; JA138-JA142; JA337-344). Coupled with the fact that Hebb can only be and speak on public property, not private property, § 10-85(2) prevents him from using amplification or a plastic cone close enough to AHC clinic to be heard or seen, in any direction. (JA030-JA033; JA101-JA102; JA137).

The amplification and plastic cone ban is oppressive on all days AHC clinic is open. (JA142). When Hebb's speech was first nixed, AHC clinic was open on Thursdays, Fridays, and Saturdays. (JA142). The clinic is also now open on Tuesdays and Wednesdays. (JA142). Hebb has no opportunity to use amplified or plastic cone speech outside of AHC clinic on any of these weekdays because the surrounding medical clinics are also open. (JA142). And practically, Hebb's speech is stymied on Saturdays too. (JA142; JA144). He attempted to use amplification one Saturday, when the medical clinic behind AHC clinic was closed, but his efforts were in vain. (JA143; JA144). Because he had to stand 150 feet away from AHC clinic, and behind it, Hebb needed to speak louder to be heard, but Asheville applied a 65-decibel level cap to his

speech, leaving his messaging on Saturday as ineffectual as it is on other days. (JA143; JA144).

Speaking without amplification or a plastic cone is not a viable option for Hebb. (JA127-JA128). It would cause him to yell, thwarting his purpose for being there. (JA127-JA128). Compounding the problem, the City enforces § 10-85(2) selectively to only include speech on public ways, not private property, letting AHC clinic use amplified noise to drown out Hebb's oral speech. (JA144-JA145). Taking advantage, AHC clinic staff, escorts, and supporters have played music and other noise through amplifiers on private property, keeping visitors from hearing unamplified messages from Hebb. (JA145).

### *Hebb Brings Legal Challenge for Relief Regarding § 10-85(2)*

To obtain nominal damages and injunctive relief from the ongoing infringement on his speech, Hebb, on October 20, 2022, filed a verified complaint against the City of Asheville and Woody, challenging § 10-85(2) and its application to his amplified speech near AHC clinic, urging claims for violations of free speech and due process. (JA002 [Doc. 1]; JA007-JA040). A few days later, Hebb filed a motion for preliminary injunction, along with exhibits and memorandum, to enjoin Asheville from applying § 10-85(2) to his amplified speech. (JA002 [Docs. 3 & 4]). In lieu of an answer, Asheville filed a motion to dismiss (JA002 [Doc. 9]; JA041-JA044). Hebb entered a stipulation to dismiss Woody in his individual capacity (JA003 [Doc. 11]; JA0045).

On February 8, 2023, the district court issued a Memorandum Decision and Order granting Hebb's motion for preliminary injunction and denying Asheville's motion to dismiss. (JA003 [Doc. 14]; JA048-JA084). The Court held Hebb set forth plausible claims in his verified complaint that the amplification ban in § 10-85(2) is unconstitutional (JA0082-JA0083), determining Hebb is likely to prevail on his free speech and due process claims. (JA063-JA079). Following this Order, defendants filed their answer. (JA003 [Doc. 15]; JA085-JA107).

### Asheville Amends § 10-85(2) During Litigation in a Non-Substantive Way

Several months later, on August 22, 2023, the City of Asheville amended § 10-85(2) amid litigation. (JA116). These amendments did not alleviate Hebb's concerns nor were they intended to do so. (JA113-JA116; JA146-JA147; JA346). As a preface to the amendments, the City Council declared its intention to make only "non-substantive" changes to "clarify" certain aspects of § 10-85(2). (JA346). Asheville added a definition for "Amplified Sound" in § 10-82 to encompass any device that increases sound level or volume as well as a definition for "Medical Clinic" to encompass both inpatient and outpatient services. (JA346). Regarding the ordinance's exemption for AHC clinic and other medical clinic properties, allowing clinic staff and escorts to avoid the amplification ban applied to Hebb, the City double-downed on the inconsistency, adding the following statement to § 10-85(2): "For purposes of clarity, it is expressly noted that this prohibition does not apply to sounds originating from public schools or

medical clinics themselves, as such sounds are already subjected to decibel limitations under Section 10-83 of the City Code." (JA346).

True to the description, the amendments are non-substantive, having no impact on the claims brought by Hebb in this action, except to exacerbate them. (JA146-JA147; JA346). This confirmation that AHC clinic can use amplification while Hebb is barred from amplification only heightens Hebb's concerns. (JA147; JA346). The inclusion of inpatient facilities within the meaning of "Medical Clinics" is also concerning, for it serves to broaden the impact on Hebb's speech even moreso. (JA147; JA346). This "clarification" incorporates inpatient facilities near AHC clinic, like Mission Hospital and Asheville Detox Center, making the ban expand further, particularly, on Saturdays. (JA147). The practical parameters of the ban on Hebb's amplified speech around AHC clinic, following amendment to § 10-85(2), is now larger, and approximately as follows: 3,087 and 3,111 feet to the north (JA138; JA337-JA338), 4,459 and 4,655 feet to the south (JA139-JA140; JA339-JA340), 1,144 and 1167 feet to the east (JA140-JA141; JA341-342), and 461 and 451 feet to the west (JA141-JA142; JA343-JA344). Additionally, the "clarification" that "Amplified Sound" concerns a device that increases sound utterly fails to address the vagueness of the application to plastic cones, despite the district court pointing out this vagueness in its ruling on the preliminary injunction. (JA077-JA079; JA346). While Hebb believes a plastic cone directs sound, and does not increase volume, Asheville has the opposite view, and declined to indicate

a different stance with its amendment. (JA148; JA346).[2]  Thus, following the amendment to § 10-85(2) the ordinance continues to unconstitutionally restrict Hebb's protected speech and now in an even greater way. (JA149; JA346).

### The District Court issues a Final Ruling, which Asheville Appeals

Notwithstanding the futility of the "non-substantive" amendment, a couple of months following the passage, on October 13, 2023, Asheville filed its second motion to dismiss, along with a request to dissolve the preliminary injunction as moot. (JA108-JA112). Hebb filed a response to this motion, and on November 15, 2023, Hebb filed his motion for summary judgment, as well as exhibits, setting out a statement of undisputed facts and legal argument in an accompanying memorandum. (JA004 [Doc. 25]; JA117-JA346). Asheville did not seek summary judgment.

Ruling on the pending motions, the district court denied Asheville's motion to dismiss and granted Hebb's motion for summary judgment, awarding Hebb his requested injunctive relief and nominal damages. (JA350-JA391). Later, Asheville filed its notice of appeal. (JA392-JA393).

---

[2] Initially, the effect of Asheville's amendment adding a definition for amplified sound was less than clear. Asheville pursued a motion for dismiss for mootness as though the unconstitutional aspects of the ordinance had been cured. (JA108-JA112). Though its motion was vague, the mootness claim implied some kind of meaningful change. But as evidenced in subsequent briefing, including that before this Court, Asheville never intended to remedy this constitutional concern with its amendment; the City sought to fortify it.

# SUMMARY OF ARGUMENT

The district court appropriately granted Hebb's motion for summary judgment. In the absence of disputed facts, Hebb is entitled to judgment as a matter of law on his free speech and due process claims.

Section 10-85(2)'s broad ban on amplified and plastic cone aided speech on public ways outside of AHC clinic is not a reasonable time, place, and manner restriction. Asheville has no genuine interest in barring protected speech like Hebb's, as demonstrated by its selective enforcement of the ban. Though the City props us an interest in curbing excessive noise, it only regulates pro-life speech on public property, not oppositional speech coming from nearby private property, revealing it is only interested in censoring a certain perspective.

Neither is the ban narrowly tailored, eliminating a significant amount of protected speech that is not loud, raucous, or otherwise excessive and effectively stretching the buffer zone surrounding AHC clinic to thousands of feet away. Asheville cannot justify this overarching infringement on speech, unable to point to any evidence that less-speech-restrictive alternatives, like existing decibel level caps and multi-factor noise disturbance standards, cannot suitably address its supposed noise concerns. The ban also fails to leave Hebb with any workable means for reaching his intended audience with his intended message.

The inclusion of plastic cones in its prohibition also raises due process concerns. Section 10-85(2) did not initially have a definition for amplified sound and its recently

supplied definition only states the term covers devices that increase the volume of sound.  Since non-electronic plastic cones do not seemingly increase volume level, and only direct sound, Asheville fails to give Hebb fair notice that use of plastic cone could lead to criminal sanction.

For these reasons, Hebb is entitled to relief for these free speech and due process violations as awarded by the court below.  He requires permanent injunctive relief to protect his constitutional rights in the future and nominal damages to vindicate violation of those rights in the past.  This Court should affirm the judgment below.

## ARGUMENT

*De novo* review is proper for this appeal.  The Court reviews *de novo* the lower court's denial of Asheville's motion to dismiss.  *Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co.*, 95 F.4th 181, 189 (4th Cir. 2024).  Review under Fed. R. Civ. P. 12(b)(6) requires this Court to accept all facts alleged in the complaint as true and in the light most favorable to the plaintiff.  *Evans v. Chalmers*, 703 F.3d 636, 646 (4th Cir. 2012).  The grant of Hebb's summary judgment is likewise subject to *de novo* review. *Metro. Washington Airports Auth. v. Pan*, 106 F.4th 355, 360 (4th Cir. 2024).  Summary judgment is warranted when there are no genuine issues of material fact and judgment is appropriate for the movant as a matter of law.  Fed. R. Civ. P. 56.  "The mere existence of a scintilla of evidence in favor of the non-movant's position is insufficient to withstand the summary judgment motion," and "conclusory allegations or denials,

without more, are insufficient to preclude granting the summary judgment motion." *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021) (citations and internal quotation marks omitted).

Analysis under the relevant standards shows the district court correctly denied Asheville's motion to dismiss and granted Hebb's motion for summary judgment. Hebb is entitled to a permanent injunction for the ongoing violations of his rights to free speech and due process, enjoining Asheville from enforcing ordinance § 10-85(2) against his conversational and constitutionally protected expression on public ways outside AHC clinic. He is also deserving of retrospective relief in the form of nominal damages.

## I.    Asheville's Ban on "Amplified Sound" Outside of AHC Clinic Violates Hebb's Right to Free Speech

In assessing a free speech claim, this Court is to consider the constitutionality of the desired speech and the type of venue sought for the speech, and from this information, determine whether the speech restriction can overcome the level of scrutiny dictated by these two factors. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985); *Reynolds v. Middleton*, 779 F.3d 222, 225 (4th Cir. 2015).

### A.    Hebb's speech outside of AHC clinic is constitutionally protected and public rights-of-way are traditional public fora

Hebb wishes to share his views about abortion with individuals visiting AHC clinic through an amplification device or a plastic cone.  The First Amendment fully protects his speech about abortion.  *Hill v. Colorado*, 530 U.S. 703, 715-16 (2000). Also,

the First Amendment shields the reasonable use of amplification, recognizing it as an important means for speech. *Saia v. New York*, 334 U.S. 558, 561-62 (1948). "[L]oudspeakers are indispensable instruments of effective communication." *U.S. Labor Party v. Pomerleau*, 557 F.2d 410, 412 (4th Cir. 1977) (citation omitted).

Hebb wants to communicate his beliefs on sidewalks and rights-of-way in Asheville, and specifically, near AHC clinic property. These public spaces occupy a "special position" in forum analysis. *McCullen v. Coakley*, 573 U.S. 464, 476 (2014) (citation omitted). They are "archetypical examples" of traditional public fora, areas so synonymous with free speech that no particularized inquiry into their forum status is necessary. *Frisby v. Shultz*, 487 U.S. 474, 481 (1988); *Warren v. Fairfax Cty.*, 196 F.3d 186, 191 (4th Cir. 1999). The venerated classification is sure, and thus unaffected by proximity to an abortion clinic. *See McCullen,* 573 U.S. at 476 ("public way[s]" and "sidewalk[s]" outside abortion clinics are traditional public fora); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 761 (1994) ("public streets, sidewalks, and rights-of-way" near abortion clinic qualify as traditional public fora).

In traditional public fora, the freedom of speech is heavily guarded. *Occupy Columbia v. Haley*, 738 F.3d 107, 125 (4th Cir. 2013). Hence, the ability of a government entity to restrict expression in these places is "sharply circumscribed." *Id.* (citation omitted).

**B. Asheville ordinance § 10-85(2) is not a reasonable time, place, or manner restriction**

An ordinance infringing on protected speech in traditional public fora – as § 10-85(2) does – demands an exacting inspection to ensure the regulation is content neutral, narrowly tailored to serve a significant government interest, and leaves open ample alternative channels of communication. *Child Evangelism Fellowship of S.C. v. Anderson Sch. Dist. Five [CEF]*, 470 F.3d 1062, 1067 (4th Cir. 2006). Asheville bears the burden of proving its ordinance meets each requirement. *Billups v. City of Charleston*, 961 F.3d 673, 685 (4th Cir. 2020).

The City cannot meet its burden, for several reasons. Section 10-85(2) is an incongruent measure, lacking a genuine interest in reducing excessive noise around medical clinics and public schools, just an interest in keeping AHC clinic visitors from a certain viewpoint. Neither is the ordinance narrowly tailored, purging a significant amount of protected speech that does not risk excessive noise. Moreover, the flat ban on amplified speech fails to leave Hebb with a reasonable opportunity for conveying his desired message.

**1. The ban on amplified speech and plastic cones does not further a substantial government interest**

A restriction on protected speech in traditional public fora must further a substantial government interest. *Ross v. Early*, 746 F.3d 546, 556 (4th Cir. 2014). *See Brown v. Town of Cary*, 706 F.3d 294, 305 (4th Cir. 2013) (any proffered interest for a speech restriction ought to be a "substantial" one.). The interest that Asheville

"identif[ies is]… a substantial government interest… in protecting medical patients from excessive sound…." (Appellants' Brief [App. Br.], pp. 7-9).

This purported government interest – protecting medical patients from excessive noise – can conceivably be substantial, but the "inquiry does not stop there…." *Hulbert v. Pope*, 70 F.4th 726, 734 (4th Cir. 2023). A municipality must do more than "identif[y]" an interest in the abstract (as Asheville does here, App. Br., p. 7). *Ross*, 746 F.3d at 556. Mere lip service to a substantial interest is insufficient, *Hulbert*, 70 F.4th at 734, for a theoretical interest will never do. *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994). The City "must [1] demonstrate that the recited harms are real, not merely conjectural, and [2] that the regulation will in fact alleviate these harms in a direct and material way." *Id.; see Hulbert,* 70 F.4th at 734 (reciting this standard). Asheville falls short in both respects.

### a. The supposed interest is not genuine

Asheville's stated interest is not a real one. When the noise ordinance was presented to City Council for passage, Asheville officials specified the top noise concerns in the City, and tellingly, amplified noise outside of medical clinics (or public schools) was not one of them.[3] The City's lack of concern about excessive noise

---

[3] Ashville does not attempt to explain its claimed interest in controlling amplified noise outside public schools or why it believes the need for quiet is more prevalent around public schools than that of private schools. The provision about schools is a superfluous add-on intended to make the ordinance appear more reasonable – as though it is not really targeting pro-life speech outside of the abortion clinic – but the obvious absence

surrounding medical clinics is also reflected in the ordinance itself. Section 10-85(2) regulates amplified sound outside the property lines of AHC clinic and other medical clinics, but not any amplified sound stemming inside the property lines. Indeed, to remove any doubt about the City's intentions, Asheville amended its ordinance to explicitly enshrine this inequitable treatment.

Ashevill'es one-sided application of the amplification ban is revealing. Permitting AHC clinic employees and escorts to use loud electronic amplification to promote abortions in virtually the same space where it prohibits the use of all amplification and even plastic cones to oppose abortions belies Asheville's supposed interest in protecting medical patients from excessive noise. Asheville has no answer for how amplified noise on public ways in front of medical clinics can be a genuine problem when it freely allows amplified noise in much closer proximity to the clinics. Further, in excusing clinic use of amplification from the ordinance, Asheville sanctions AHC clinic to not only flagrantly violate the buffer zone regarding its own structure but also adjacent medical clinics that come within the prohibited distance. Exemptions from a speech restriction like this one "diminish the credibility of the government's rationale for restricting speech in the first place." *City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1994). Asheville's lenience for amplification on clinic grounds shows the City has little

---

of any interest in amplified noise in this context exposes the true purpose of the ordinance.

interest in limiting amplified noise or noise generally in these places. The discrepancy confirms the City only wishes to eliminate anti-abortion viewpoints.

The holding in *Saieg v. City of Dearborn*, 641 F.3d 727 (6th Cir. 2011), is persuasive on this point. There, the Sixth Circuit struck down a ban on literature distribution occurring on sidewalks in downtown Dearborn, Michigan during a public festival. *Id.* at 740-41. The appellate court doubted the city's asserted interest in preventing congestion and traffic flow on the sidewalks because the city permitted pedestrian traffic and vendors on those same sidewalks. *Id.* at 737-38. Figuring the toleration of these activities undercut the expressed reason for the leafletting ban, the court considered the interest insignificant. *Id.* In the same vein, Asheville's tolerance for amplification from AHC clinic staff and escorts on private property closer to individuals inside the medical clinic cuts against the assertion the City wants to get rid of excessive noise outside of the clinics.

The precedent Ashville cites does not back up its alleged interest. (App. Brief, p. 8). The Supreme Court, in *Hill v. Colorado*, did not consider noise level or any limitation on amplification use. 530 U.S. at 726. And, in *Madsen v Women's Health Ctr. Inc.*, the Supreme Court upheld a restriction prohibiting noise that could be heard inside a facility. 512 U.S. at 772. Notably, § 10-85(2) does not require amplified sound be heard inside a structure for a violation, or that it be heard at all by individuals it claims to protect, only that the speech emit from an amplification device or a plastic cone on a public way.

### b. The supposed interest is not in line with the restriction

Aside from the incredulity of the stated interest, the ordinance is not especially useful in advancing the interest, further eroding its significance. To establish a substantial government interest, Asheville is obliged to show how the ordinance remedies its specified concern of excessive noise outside of medical clinics. *See Hulbert*, 70 F.4th at 734 (must show ordinance promotes stated interest). The City must demonstrate § 10-85(2) materially furthers the interest by either redressing past harms or preventing future ones. *Ross*, 746 F.3d at 555. Asheville does not have much to offer in this regard. It does not expound on how the ordinance can regulate excessive noise by focusing purely on the use of amplification and plastic cones and only that occurring on public ways outside of clinic grounds.

Instead, Asheville relies on *Reynolds v. Middleton* for the proposition that the City need not substantiate an interest, just baldly identify it. (App. Br., pp. 7-8). *Reynolds*, however, does not go this far. In that case, this Court held an evidentiary record is not "always" required to establish a substantial government interest, noting that "common sense" and "prior holdings of cases" can be adequate for demonstrating its existence. 779 F.3d at 227-28. The Court excused the need for objective evidence when the connection between the stated interest and the restriction is "obvious." *Id.* at 229 n. 4. But *Reynolds* cannot be read to uphold a government interest that fails to match the speech restriction, as exhibited here.

The record reflects Asheville's professed concern in reducing excessive noise near medical clinics or public schools is a farce. Asheville's only apparent motivation for the ordinance is to aid AHC clinic in silencing anti-abortion views outside the clinic, a plainly inadequate basis. Suppressing a message for its own sake is not a legitimate (much less a substantial) interest. *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 95, 98 (1972); *see also McCullen*, 573 U.S. at 477 (government has no legitimate interest in "selectively…shield[ing] the public from some kinds of speech on the ground that they are more offensive than others."). Asheville's ban on amplified speech around medical clinics and public schools does not serve a substantial government interest.

## 2. The ban on amplified speech and plastic cones is not narrowly tailored

Narrow tailoring requires a speech restriction not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989). To keep a government entity from sacrificing too much speech for the sake of convenience, the tailoring requirement demands a "close fit between the ends and means." *McCullen*, 573 U.S. at 486. In other words, a sufficiently tailored restriction should eliminate no more than "the exact source of evil that it seeks to remedy." *Frisby*, 487 U.S. at 485. A speech restriction will thus not be narrowly tailored if its scope covers significantly more activity than necessary to address the purported concern. *Reynolds*, 779 F3d at 230-31. It is of no import that the regulation is the most prudent or easiest approach. *Billups*, 961 F.3d at 688. A

government entity must prove that "less-speech-restrictive alternatives" cannot achieve the government interest. *Id.* at 687-88. Asheville's ban on amplified and plastic cone speech falls outside of these constitutional boundaries.

### a. Ordinance removes too much speech

In its brief, Asheville loosely refers to having an interest in avoiding "unwanted" or "harmful" speech. (App. Br., p. 10). But the allowance for speech cannot rise or fall on whether speech is wanted. *See Forsyth Cnty. v. Nationalist Movement,* 505 U.S. 123, 134-45 (1992) ("Listeners' reaction to speech is not a content-neutral basis for regulation."). Further, any harm attributed to speech must relate to the volume, not content. *See Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 831 (1995) (government entity may not regulate speech based on its content or message). The only legitimate interest Asheville can maintain for barring amplified speech is the prevention of excessive noise volume. *See Ward,* 491 U.S. at 789. And in determining whether a given noise is excessive, this Court has set the bar: "restrictions on volume must be no greater than necessary to prevent disturbance from loud and raucous noise." *Pomerleau*, 557 F.2d at 412.

In eradicating amplified speech and plastic cones no matter the volume of the sound, Asheville's ordinance does not meet the standard. The underlying premise that all amplified noise is necessarily loud and raucous is not factually supportable, certainly not in the record before this Court. As in Hebb's intended use, an amplifier or a plastic cone can be used in a conversational way, falling well within reasonable decibel levels.

And the mere prospect that amplification can potentially be loud and raucous is inadequate for restriction. In *Reeves v. McConn*, the Fifth Circuit held a similar flat ban on amplification in certain parts of the city and at certain times was not a narrowly tailored restriction. 631 F.2d 377, 383-85 (5th Cir. 1980). The appellate court reasoned "the city may not broadly prohibit reasonably amplified speech merely because of an undifferentiated fear that disruption might sometimes result." *Id.* at 388. *See also Pomerleau*, 557 F.2d at 413 (invalidating ban on amplified speech that was not necessarily loud). The same principle applies in this case. Asheville cannot ban all amplification devices and plastic cones out of some speculative fear that a person might use a device too loudly.

In this regard, Asheville's ordinance is overinclusive. The ordinance is also underinclusive. Section 10-85(2) fails to address a universe of noise occurring outside of medical clinics and public schools that does not involve amplification but is actually loud and raucous. Missing the mark in these two respects reflects a gross lack of tailoring. In arguing the counter position, Asheville does not endeavor to show how a ban on amplified speech or plastic cones advances its supposed goal. Instead, Asheville appears to suggest that bans on amplified speech are narrowly tailored *per se*, as a matter of law. (App. Br., pp. 10-13). None of the cases cited by Asheville advance this tenuous position, and all are factually distinguishable.

In *O'Connell v. City of New Bern*, the provision at issue prohibited noise that was clearly audible more than 100 feet from the amplification device. 447 F. Supp. 3d 466,

473-74 (E.D.N.C. 2020). Deducing noise clearly audible from this distance is objectively loud, the district court considered the ordinance sufficiently tailored to restrict loud noise. *Id.* Conversely, Asheville's ordinance ties a violation to the property line of a structure, not the source of the sound. If Asheville applied a like restriction to Hebb, his amplified speech would be left alone. But by linking the 150-foot roving and expanding buffer zone to a clinic or a school – instead of the source of the noise – Asheville eliminates protected speech that is neither loud nor raucous.

Similarly, *Pine v. City of West Palm Beach*, 762 F.3d 1262 (11th Cir. 2014), undermines Asheville's argument. In that case, the Eleventh Circuit construed and evaluated an ordinance in West Palm Beach banning amplified sound within 100 feet of a health care facility. *Id.* at 1264. The appellate court determined that a ban on all amplified sound would indeed raise "grave constitutional questions" about the restriction. *Id.* at 1270. However, the West Palm Beach ordinance, unlike the subject ordinance, was susceptible to an interpretation to only ban amplified noise considered loud, raucous, or unreasonably disturbing. *Id.* at 1270-72. Had Asheville applied its noise ordinance in a similar manner – to only ban loud and raucous noise – it could avoid constitutional difficulty. A narrowly tailored approach would be for the City to ban amplified speech when the volume is unreasonably loud and raucous, which Asheville refuses to do.

*Pine* is further distinguishable because West Palm Beach's ordinance applied equally to private property and public property. *Id.* at 1267. For the same reason, *Medlin*

*v. Palmer*, 874 F.2d 1085 (5th Cir. 1989), a case upon which Asheville relies heavily, is inapposite.[4] In *Medlin*, Dallas restricted the use of a loudspeaker or sound amplifier within 150 feet of certain medical facilities, schools, and nursing homes, among other places. *Id.* at 1087 n. 1. Yet Dallas did not draw the same distinction Asheville does with public and private property within the banned distance, intending to ban devices no matter where they are located. *Id.* The focus of the ordinance was on noise, not the perspective of the speaker (as here). *Id.* at 1090. Ironically, Asheville emphasizes verbiage in *Medlin* stating the ordinance there "is tailored so as to protect people suffering from ill health, the aged, and school children from nuisance of loudspeaker noise regardless of what message issues from the loudspeaker." (App. Br., p. 12 quoting *Medlin*, 874 F.2d at 1090). Ashville does not tailor its ordinance in this way. Section 10-85(2) does not shield medical patients and school children from amplified speech or noise "regardless of what message issues from the loudspeaker," just pro-life messaging emanating from a nearby public way.

A ban on amplification as such has the natural and regrettable consequence of abolishing certain types, typically disfavored, speech. *See, e.g., Casey v. City of Newport, R.I.*, 308 F.3d 106, 115-17 (1st Cir. 2002) (city's total ban on amplification near

---

[4] Asheville urges this Court to reverse the court below to avoid a "circuit split" with *Medlin*. (App. Br., pp. 4-6). To the extent this Court is concerned about ruling differently from another appellate court, Asheville's foreboding of a circuit split is overwrought and just plain wrong. Affirming the district court's decision would do no such thing; it would not conflict with *Medlin*.

residential area was not narrowly tailored because it effectively eliminated select messages). Too easily, "[a]nnoyance at ideas can be cloaked in annoyance at sound." *Saia.*, 334 U.S. at 562. Asheville's amplification ban exemplifies this worry, eviscerating Hebb's point of view. Hebb wants to engage with individuals as they walk from their cars in the parking lot to the AHC clinic. For him to share his message in his desired conversational tone, or to be understood, he needs amplification, or if not available, a plastic cone, within 150 feet of AHC clinic. And for Hebb to be heard at all, he cannot go much further than the 150-foot buffer. Section 10-85(2) precludes it all.

What's more, the practical, real-time effect of Asheville's ordinance is to stretch the perimeter of the buffer zone far beyond the designated perimeter of 150 feet around the clinic, extending thousands of feet in several directions, due to the overlapping buffer zones surrounding the various medical clinics located in the same medical zoned area as AHC clinic. The ordinance forces Hebb to use an amplifier or a plastic cone in places where his audience cannot see him, much less hear him. To state the least, Asheville's prophylactic measure is not a narrowly tailored means for addressing any legitimate concerns over noise.

### b. Asheville cannot show alternative regulations are inadequate

Additionally, Asheville offers no proof that less-speech-restrictive methods are inadequate for its purported interest in curbing excessive noise outside of select structures. *See Billups*, 961 F.3d at 688-90 (holding tour guide licensure requirement not

narrowly tailored upon city failing to prove less-speech-restrictive alternatives could not advance interest). Asheville can prevent excessive noise in more judicious ways. Most obvious, the City could directly address volume level instead of targeting amplification devices and plastic cones. "Noise can be regulated by regulating decibels." *Saia*, 334 U.S. at 562. In fact, this sensible approach is already a built-in and significant part of the general noise ordinance for the City, § 10-81*, et. seq*., applying to various locations throughout the City, including the commercial district where AHC clinic is located. For the bulk of the remaining portions of the City, Asheville utilizes a "noise disturbance" standard, which utilizes a wide range of factors to assess a noise disturbance, including volume. Sections 10-82, 10-83(a). Asheville utterly fails to explain, much less prove, why these existing noise restrictions suddenly become unusable when noise occurs outside of medical clinics and public schools.

Indeed, as Hebb learned firsthand, Asheville applies the 65-decibel-limit to amplified speech in proximity of AHC clinic, having forced Hebb to comply with this maximum decibel limit even though he was already standing 150 feet away from the clinic. The existing decibel restriction makes the amplification ban superfluous. But in lieu of maintaining a volume-based approach, or an objective multi-factor approach focusing on a noise disturbance, Asheville singles out amplified speech and plastic cones in front of medical clinics and public schools for a flat ban in these discrete areas. "In short, [Asheville] has not seriously undertook to address the problem with less intrusive tools readily available to it." *McCullen*, 573 U.S. at 477.

Asheville offers no evidence or explanation on why an objective volume-based approach is suitable for every other sound in the City except for speech on public ways outside medical clinics (or public schools). As Asheville made clear in its recent amendment to § 10-85(2), the City relies on decibel limits (in lieu of a flat ban) for amplified noise near medical clinics and public schools if it is created by the entities themselves. The ordinance claims decibel limits apply to these entities because they are already subject to decibel limits, but so is Hebb and others who speak on public ways.

Asheville asserts a decibel reading of speech on a public right-of-way is impractical due to the "transient nature of noise occurring on public rights of way" (JA115), but neglects to explain why this is so. The City offers no proof that amplified noise is any more transient on public ways in front of medical clinics and public schools than it is anywhere else. Asheville officials can certainly take a decibel reading at the same time it detects an amplification device. The record reflects that Hebb is stationary, not transient, when he partakes in his desired speech near AHC clinic. And, to be sure, Asheville has yet to encounter any difficulties in detecting Hebb's sound level, having done so on several occasions in issuing citations to him.

While a blanket ban on amplification might make it slightly easier for officials to apply, "[t]o meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen*, 573 U.S. at 495. The glaring discrepancy in how Asheville treats anti-abortion

speech in front of AHC clinic versus every other amplified sound in the City limits reveals § 10-85(2) is not a narrowly tailored means for dealing with excessive noise.

### 3. The ban on amplified speech and plastic cones does not leave viable alternatives for communication

Section 10-85(2) is further unconstitutional for not leaving Hebb with ample alternatives for his messaging. *CEF*, 470 F.3d at 1067. An ample alternative is one that facilitates general dissemination of the message. *Ross*, 746 F.3d at 559. Asheville leaves no such avenue for Hebb and his message.

As observed by the Supreme Court, sound amplification is an "indispensable" means for "effective public speech." *Saia*, 334 U.S. at 561. The need for amplification is especially great for Hebb with his messaging outside AHC clinic. Without an amplification device or a plastic cone, Hebb is required to speak bare throat, which forces him to yell, foreclosing his ability to convey a personal, winsome message to a would-be listener. Yelling is not a viable alternative for Hebb because it is no substitute for conversational speech. *See McCullen*, 573 U.S. at 487 (speech "reduced to raising her voice at patients …[is] a mode of communication sharply at odds with the compassionate message she wishes to convey"). Moreover, no matter how loud Hebb yells, he still cannot be heard well due to AHC clinic's incessant use of amplification intended to drown out his message. By precluding Hebb's use of amplification or a plastic cone, Asheville stymies Hebb's message, keeping him from reaching his intended audience with his intended message.

Asheville contends a ban on amplification and plastic cones "by definition" will always afford speakers with ample available alternatives for their speech "if the challenged ordinance allows the speaker to disseminate their message from any distance, without use of amplification…." (App. Br., p. 13). But the mere existence of some kind of alternative is not enough. *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 758 n.15 (1976). Hebb does not just have a right to speak, correspondingly, he also has "a right to be heard." *Saia*, 334 U.S. at 560. And "[t]he right to communicate inherently comprehends the right to communicate effectively." *Reeves*, 631 F.2d at 382. For Hebb to communicate effectively he requires use an amplifier or a plastic cone.

The ample alternative analysis turns on how the messaging is impacted. An alternative is not deemed ample "if the intended message is rendered useless or is seriously burdened." *Weinberg v. City of Chicago,* 310 F.3d 1029, 1041 (7th Cir. 2002). And certain methods of speech, like those used by Hebb, are irreplaceable. *City of Ladue*, 512 U.S. at 56. In *City of Ladue*, the Supreme Court held a ban on the display of most signs from residences did not leave ample alternatives – despite leaving virtually all other forms of expression untouched – due the unique importance attributed to signs in the residential context. *Id.* at 56-57. Adopting the same reasoning, the Seventh Circuit, in *Weinberg*, held a ban on peddling within 1,000 feet of the sports arena home to the Chicago Blackhawks did not leave enough alternatives for an individual who wished to sell a book critical of the Blackhawks' manager – even though he could communicate

in any other way within the zone or sell his book anywhere outside the zone. 310 F.3d at 1041-42. And likewise, in *Edwards v. City of Coeur d'Alene*, the Ninth Circuit held that, in the context of public spaces near parades and public assemblies, leafleting and various other forms of speech were not adequate alternatives to hoisting signs aloft on poles or sticks. 262 F.3d 856, 866-67 (9th Cir. 2001).

Akin to these cases, Asheville's expulsion of amplification and plastic cones from public ways has the effect of squelching Hebb's speech altogether, leaving him with no viable alternative for conveying his message.

## II. Asheville's Ban on Plastic Cones Outside AHC Clinic Violated Hebb's Right to Due Process

With Hebb's due process claim, this Court is to evaluate the offending law and resolve whether the language provides fair notice of the prohibited conduct. *Grayned v. City of Rockford,* 408 U.S. 104, 108-09 (1972); *United States v. Comer*, 5 F.4th 535, 541 (4th Cir. 2021).

Section 10-85(2) came into effect on September 15, 2021, and from day one, Ashville applied its amplification ban to plastic cones. The enforcement was surprising because the ordinance sets out to prohibit "amplified sound" outside of select structures. Section 10-82 supplies meanings for terms in the article, but it initially omitted a definition for "amplified" or "amplified sound." And without further indication, the phrase apparently referred to an amplifier that would increase the volume of the sound, excluding plastic cones, since they tend to direct sounds and not amplify

them. But as Hebb soon learned, Asheville interprets § 10-85(2) to proscribe plastic cones as part of its ban.

In granting Hebb's motion for preliminary injunction, the district court held he was likely to prevail on his due process claim regarding plastic cones. (JA079). The court found the ordinance vague for failing to clarify and give fair notice of its application to plastic cones. (JA077-JA079).

Following this ruling, and while litigation was still ongoing, Asheville amended § 10-82 to insert a definition for the phrase "amplified sound" in the ordinance. (JA346). But, inexplicably, Asheville neglected to supply clarity for this phrase. The definitional section of the oridnance now has the following: "*Amplified Sound* means a sound augmented by any electronic or other means that increases the sound level or volume." (JA346). It omits any mention of plastic cones. Consequently, after the amendment, as before, Hebb and others are left to guess whether Asheville intends to apply the ordinance to plastic cones. The history of application of the ordinance would suggest yes, while the physics of a plastic cone would suggest no.

Laws infringing on speech in unexpected ways – like § 10-85(2)'s application to plastic cones – are vague as applied, infringing on due process rights. *See Pomerleau*, 557 F.2d at 412 (noise ordinance was vague as applied because city measured volume from anticipated location of pedestrians rather than the property line). In *Lytle v. Doyle*, this Court held application of a statute prohibiting "loitering" on an overpass unconstitutionally vague as applied to an organized protest because a reasonable

definition of "loitering" would not encompass this activity. 326 F.3d 463, 469 (4th Cir. 2003). Similarly, no reasonable definition of "amplified sound" would include plastic cones, particularly, when the supplied definition of the term requires the device to increase sound level. Stretching the meaning of "amplified sound" as well as how a plastic cone works, Asheville's application of § 10-85(2) to plastic cones makes the ordinance unconstitutionally vague.

## III. Hebb is Entitled to Relief From and For Constitutional Violations

In this action, Hebb sought permanent injunctive relief to prevent constitutional harm from occurring in the future and nominal damages of $1.00 to vindicate constitutional harm he suffered in the past. This Court should affirm the district court's ruling awarding this relief, for Hebb is entitled to receive it.

### A. Hebb deserves permanent injunction to prevent ham in the future

For permanent injunctive relief, a plaintiff must demonstrate success on the merits, irreparable harm without the injunction, the balance of hardships favors the plaintiff, and the injunction is in the best interest of the public. *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Hebb meets each factor, justifying the permanent injunction the district court granted below, enjoining enforcement of § 10-85(2) to Hebb's amplified speech.

As demonstrated herein, Hebb prevailed on the merits of his free speech and due process claims. The constitutional violations equate to irreparable harm. *See Johnson v. Bergland*, 586 F.2d 993, 995 (4th Cir. 1978) ("Violations of first amendment rights

constitute *per se* irreparable injury.") (citation omitted). Contrariwise, Asheville has not suffered and will not suffer any harm from not being able to enforce § 10-85(2). No harm can come from the inability to enforce an unconstitutional law. *Newsom v. Albemarle County Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003). And Asheville remains free to control excessive noise through valid decibel limits and the other objective sound restrictions that remain in the noise ordinance. Lastly, the permanent injunction is in the best interest of the public because "upholding constitutional rights serves the public interest." *Newsom*, 354 F.3d at 261.

Hebb deserves the permanent injunction he received from the district court.

### B. Hebb deserves nominal damages for harm incurred in the past

As shown, Asheville wielded § 10-85(2) to violate Hebb's rights to free speech and due process, depriving him of amplification and plastic cones in traditional public fora. Nominal damages should be awarded in recognition of the deprivation of his constitutional rights, even without any showing a resulting injury. *Hicks v. Ferreyra*, 64 F.4th 156, 175 (4th Cir. 2023). Though the sum he seeks is small ($1.00), the award is significant, recognizing the "importance to organized society that [constitutional] rights be scrupulously observed …." *Carey v. Piphus*, 435 U.S. 247, 266 (1978).

Hebb deserves nominal damages in this cause.

## CONCLUSION

For the foregoing reasons, Hebb respectfully requests the Court affirm the district court's rulings denying defendants' motion to dismiss as moot and motion to dissolve injunction and granting Hebb's motion for summary judgment.

## STATEMENT REQUESTING ORAL ARGUMENT

Pursuant to 4th Cir. R. 34(a), Appellee Hebb seeks oral argument for this appeal. The issues briefed in this appeal will likely trigger questions that would benefit from an oral exchange.

Dated: September 23, 2024

Respectfully submitted,

Jeffrey C. Mateer
FIRST LIBERTY INSTITUTE
2001 W. Plano Pkwy.,
Suite 1600
Plano, TX 75075
(972) 941-4444
jmateer@firstliberty.org

Brennan Tyler Brooks
Thomas More Society
309 West Washington Street,
Suite 1250
Chicago, IL 60606
(336) 707-8855
btb@btylerbrookslawyer.com

/s/Nathan W. Kellum
Nathan W. Kellum
FIRST LIBERTY INSTITUTE
699 Oakleaf Office Lane
Suite 107
Memphis, TN 38117
(972) 941-4444
nkellum@firstliberty.org

Counsel for Appellee Zachary Hebb

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i). This brief is written in Garamond, a proportionally spaced font, has a typeface of 14 point, and contains 9,323 words (as counted by Microsoft Word for Mac v. 16.87), excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

/s/Nathan W. Kellum
Nathan W. Kellum

*Counsel for Appellee*

## CERTIFICATE OF SERVICE

I certify that on September 23, 2024, the foregoing Response Brief of Plaintiff-Appellee was served on all parties or their counsel of record through the CM/ECF system.

/s/Nathan W. Kellum
Nathan W. Kellum

*Counsel for Appellee*
